## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

STEPHEN BUSHANSKY, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

AVENUE THERAPEUTICS, INC., LINDSAY A. ROSENWALD, LUCY LU, NEIL HERSKOWITZ, JAY KRANZLER, JEFFREY PALEY, AKHTAR SAMAD, and MICHAEL S. WEISS,

Defendants.

Case No.

CLASS ACTION

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

JURY TRIAL DEMAND

Plaintiff Stephen Bushansky ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder class action brought by Plaintiff on behalf of himself and all other public stockholders of Avenue Therapeutics, Inc. ("Avenue" or the "Company") against Avenue and the members of Avenue's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which Avenue will be acquired by InvaGen Pharmaceuticals Inc. ("InvaGen") in a two-stage transaction (the "Proposed Transaction").

2.      On November 13, 2018, Avenue and InvaGen issued a joint press release announcing they had entered into a Stock Purchase and Merger Agreement dated November 12, 2018 (the "SPMA") to sell Avenue to InvaGen in a two-stage transaction.  Upon the first stage closing (the "First Stage Closing"), InvaGen will acquire, through the issuance of new shares, a 33.3% stake in the Company on a fully-diluted basis (the "Stock Purchase Transaction"), for $35 million, or approximately 5,833,333 shares at $6.00 per share.  Upon the second stage closing (the "Second Stage Closing"), InvaGen, through its wholly-owned subsidiary Madison Pharmaceuticals Inc. ("Merger Sub"), will acquire the remaining outstanding shares of Avenue for up to $180 million in the aggregate (the "Merger Transaction").  Pursuant to the terms of the SPMA, at the Second Stage Closing, each Avenue stockholder will receive (i) a pro rata portion of the total merger consideration of up to $180 million, subject to certain deductions, which portion is currently expected to be approximately $13.92 per share; and (ii) a contingent value right ("CVR") which represents the right to receive a certain contingent cash payment upon the achievement of certain milestones relating to annual net sales and gross profit targets of IV Tramadol, pursuant to a contingent value rights agreement ("CVR Agreement") for each share of Avenue common stock they own (together, the "Merger Consideration").  The Proposed Transaction is valued at approximately $215 million.

3.      On December 21, 2018, Avenue filed a Definitive Proxy Statement on Schedule 14A (the "Proxy Statement") with the SEC.  The Proxy Statement, which recommends that Avenue stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) Avenue's financial projections, relied upon by the Company's financial advisor, Oppenheimer & Co. Inc. ("Oppenheimer"), in its financial analyses, which are **wholly omitted** from the Proxy Statement; (ii) the data and inputs underlying

the financial valuation analyses that support the fairness opinion provided by Oppenheimer; (iii) the background process leading to the Proposed Transaction; (iv) Oppenheimer's potential conflicts of interest; and (v) potential conflicts of interest faced by Company insiders.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as Avenue stockholders need such information in order to make a fully informed decision whether to vote in favor of the Proposed Transaction or seek appraisal.

4.      In short, unless remedied, Avenue's public stockholders will be forced to make a voting or appraisal decision on the Proposed Transaction without full disclosure of all material information concerning the Proposed Transaction being provided to them.  Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.      This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## THE PARTIES

8.      Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Avenue.

9.      Defendant Avenue is a Delaware corporation, with its principal executive offices located at 2 Gansevoort Street, 9th Floor, New York, New York 10014.  The Company is a specialty pharmaceutical company that acquires, licenses, develops, and commercializes products primarily for use in the acute/intensive care hospital setting.  Avenue's common stock trades on the NASDAQ Capital Market under the ticker symbol "ATXI."

10.     Defendant Lindsay A. Rosenwald ("Rosenwald") has been Executive Chairman of the Board since the Company's inception on February 9, 2015.  Defendant Rosenwald has been Chairman and Chief Executive Officer ("CEO") of Fortress Biotech, Inc. ("Fortress") since December 2013.

11.     Defendant Lucy Lu ("Lu") has been President, CEO and a director of the Company since its inception on February 9, 2015.  From February 2012 to June 2017, defendant Lu previously served as the Executive Vice President and Chief Financial Officer of Fortress.

12.     Defendant Neil Herskowitz ("Herskowitz") has been a director of the Company since August 2015.

13.     Defendant Jay Kranzler ("Kranzler") has been a director of the Company since February 2017.

14.     Defendant Jeffrey Paley ("Paley") has been a director of the Company since December 2015.

15.     Defendant Akhtar Samad ("Samad") has been a director of the Company since December 2015.

16.     Defendant Michael S. Weiss ("Weiss") has been a director of the Company since February 2015.  Defendant Weiss also serves in several capacities at Fortress, most recently as Executive Vice Chairman since February 2014.

17.     Defendants identified in paragraphs 10-16 are referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

18.     InvaGen is a New York corporation with its principal offices located at Site B, 7 Oser Ave., Hauppauge, New York 11788.  InvaGen is a leading generic pharmaceutical company engaged in development, manufacturing, marketing and distributing in generic pharmaceuticals with a focus on a wide range of therapeutic areas.  InvaGen is an indirect wholly-owned subsidiary of Cipla Limited ("Cipla"), an Indian multinational pharmaceutical and biotechnology company, headquartered in Mumbai, India.

19.     Merger Sub is a Delaware corporation and a wholly-owned subsidiary of InvaGen.

20.     Fortress is a biopharmaceutical company dedicated to acquiring, developing and commercializing novel pharmaceutical and biotechnology products.   Fortress owns approximately 34% of the Company's outstanding common stock and all of the Company's issued and outstanding shares of Class A Preferred Stock (250,000 Class A Preferred Shares). Fortress controls a voting majority of Avenue's common stock by virtue of its preferred stock ownership.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Avenue common stock

(the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

22.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

23.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of December 13, 2018, there were 10,667,714 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by Avenue or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

24.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

a)      Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

b)      Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

c)      Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

25.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

27.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

**Background of the Company**

28.     Founded in 2015, Avenue is a New York-based specialty pharmaceutical company that acquires, licenses, develops, and commercializes products primarily for use in the acute/intensive care hospital setting.  The Company is a subsidiary of Fortress, a biopharmaceutical company that acquires, develops and commercializes novel pharmaceutical and biotechnology products.

29.     Avenue is focused on the development and commercialization of its product candidate, intravenous ("IV") Tramadol, for the management of moderate to moderately severe postoperative pain.  Tramadol is a synthetic dual-acting opioid that has been used worldwide for over 30 years.  Oral Tramadol, a Schedule IV drug, has a well-established efficacy and safety profile, and is currently approved and marketed in the U.S. for moderate to moderately severe pain in adults.  There is currently no approved IV formulation in the U.S.

30.     Avenue's IV Tramadol is currently in Phase 3 clinical trials.  On May 21, 2018, the Company issued a press release announcing positive topline Phase 3 data for IV Tramadol in the management of postoperative pain.  According to the press release, Avenue's first Phase 3 trial of IV Tramadol achieved the primary endpoint of a statistically significant improvement in

Sum of Pain Intensity Difference over 48 hours ("SPID48") compared to placebo in patients with moderate to moderately severe postoperative pain following bunionectomy surgery.  The trial also met its key secondary endpoints and demonstrated a clear dose response.  In the press release, defendant Lu was quoted as stating:

> IV tramadol has the potential to provide a convenient bridge to the widely prescribed oral tramadol. This combination could displace Schedule II narcotics altogether for many patients, and provide a treatment option with less potential for abuse and a lower risk of dependence . . . .  We are excited about these results and look forward to initiating a second pivotal Phase 3 trial in the third quarter and, assuming positive data from that study and our ongoing safety trial, we anticipate filing an NDA with the U.S. Food and Drug Administration in late 2019.

**The Sale Process**

31.     On May 21, 2018, the Company announced positive data from the first Phase 3 study in patients undergoing bunionectomies.

32.     On June 13, 2018, the Board, defendant Lu and Joseph Vazzano ("Vazzano"), Vice President, Finance and Accounting and Principal Financial Officer of Avenue met and agreed to authorize a "strategic alternative" exploration.

33.     On May 31, 2018, the Board engaged Torreya Capital ("Torreya") to explore interested royalty funds and potential partnerships.  Thereafter, the Company met or conducted calls with interested royalty fund and potential partnership parties throughout the summer of 2018.  In all, 22 potential partners evaluated the Company.

34.     The Company received an initial indication of intent at the end of July 2018 from InvaGen and two additional indications of intent from two other interested parties in August 2018.

35.     On August 20, 2018, InvaGen provided the Company with an improved term-sheet and non-binding offer.  InvaGen's offer was for 35% ownership of the Company for $35

million, followed by acquisition of the remainder of the Company for an additional $110-220 million if IV Tramadol obtained FDA approval for moderate to moderately severe post-operative pain and was listed as a Schedule IV drug before 2021.  The Company sent InvaGen a counter offer on August 31, 2018.

36.     On September 3, 2018, Parent submitted a revised offer.   The revised offer contemplated a two stage transaction.  At the first stage closing, InvaGen proposed to pay $35 million for shares equaling a 33.3% stake in the Company.  At the second stage closing, InvaGen proposed to pay an additional up to $165-$185 million and additional payments contingent on IV Tramadol achieving certain milestones, as long as IV Tramadol obtained FDA approval for moderate to moderately severe post-operative pain and was listed as a Schedule IV drug by December 2020.

37.     On September 28, 2018, the Special Committee met and discussed, among other things, the current timeline of IV Tramadol development and evaluation and terms relating to the current management team.

38.     From September 28, 2018 to November 10, 2018, defendant Lu and Vazzano, InvaGen, and their respective counsel, exchanged drafts of the SPMA and related agreements and discussed the terms of a CVR agreement for certain sales targets and gross profits to be paid to former Company stockholders following the Merger Transaction.

39.     On October 19, 2018, the Special Committee, consisting of defendants Kranzler, Paley and Samad (the "Special Committee") met and discussed the estimated second stage per share price calculation and estimated the price to be $14.78 per share at second stage closing. The Special Committee also discussed employee incentive grants.

40.     On November 7, 2018, the Board met and discussed InvaGen's proposed terms, including the $35 million price for 33.3% of the Company as the first stage closing and an aggregate second stage closing price for all of the Company's outstanding remaining shares of up to $180 million, subject to certain deductions, and subject to certain conditions being satisfied. The Board also discussed the CVR agreement.

41.     On November 12, 2018, the Special Committee, Board, defendant Lu and Vazzano met.   At the meeting, Oppenheimer rendered its fairness opinion and the Special Committee recommended the Board approve the SPMA.   Thereafter, the Board met and approved the SPMA.  Avenue and InvaGen subsequently executed the SPMA.

**The Proposed Transaction**

42.     On November 13, 2018, Avenue and Cipla issued a joint press release announcing the Proposed Transaction, which states, in relevant part:

MUMBAI, India & NEW YORK, Nov. 13, 2018 (GLOBE NEWSWIRE) -- InvaGen Pharmaceuticals Inc. ("InvaGen"), a subsidiary of the leading global pharmaceutical company Cipla Limited, today announced that it has entered into definitive agreements with two closing stages for a proposed acquisition of Avenue Therapeutics, Inc. (NASDAQ: ATXI) ("Avenue"), a Fortress Biotech (NASDAQ: FBIO) company focused on the development and commercialization of intravenous (IV) Tramadol. The transaction will be subject to Avenue stockholders' and regulatory approvals, and other closing conditions.

At the first stage closing, InvaGen or its affiliates will acquire, through the issuance by Avenue of new shares, shares representing a 33.3% stake in Avenue's capital stock on a fully diluted basis for $35 million. Based on current assumptions, such stake is expected to consist of 5,833,333 shares of Avenue's common stock issued at $6.00 per share. Simultaneously with the closing of the stock issuance, InvaGen or its affiliates will appoint three members (including one independent) on Avenue's seven-member Board of Directors.

At the second stage closing, InvaGen or its affiliates will acquire the remaining shares of Avenue's common stock, pursuant to a reverse triangular merger with Avenue remaining as the surviving entity, for up to $180 million in the aggregate, which is currently expected to represent approximately $13.92 per share, subject to certain terms to be outlined in the Form 8-K and proxy statement to be filed by

Avenue with the SEC in connection with the proposed transactions. The second stage closing is subject to the satisfaction of certain closing conditions, including conditions pertaining to U.S. FDA approval, labeling, scheduling and the absence of any REMS or similar restrictions in effect with respect to IV Tramadol.

**Umang Vohra, Managing Director & Global Chief Executive Officer, Cipla, said:** "Our investment in and proposed acquisition of Avenue establishes our presence in the specialty institutional business in the U.S. The novel intravenous drug delivery method of Tramadol addresses extremely crucial and hitherto unmet needs in pain management. This investment is in keeping with our stated intention to build a specialty pipeline in the U.S. market, and reinforces Cipla's innovation-led approach and commitment to caring for the life of patients."

**Lucy Lu, M.D., President & Chief Executive Officer, Avenue, said:** "We are very pleased to partner with InvaGen to accelerate the Phase 3 clinical development and potential commercialization of IV Tramadol in the United States. IV Tramadol offers a novel mechanism of action among intravenous analgesics and could be an important new therapy that fills a significant gap in pain management. We believe that this transaction creates significant value for our shareholders and creates a path to maximize their return on investment."

## The Proxy Statement Contains Material Misstatements and Omissions

43.     The defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Avenue's stockholders.  The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote their shares in favor of the Proposed Transaction or seek appraisal.

44.     Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) Avenue's financial projections, relied upon by the Company's financial advisor, Oppenheimer, in its financial analyses, which are *wholly omitted* from the Proxy Statement; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Oppenheimer; (iii) the background process leading to the Proposed Transaction; (iv) Oppenheimer's potential conflicts of interest; and (v) potential conflicts of interest faced by

Company insiders.   Accordingly, Avenue stockholders are being asked to make a voting or appraisal decision in connection with the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning Avenue's Financial Projections***

45.    The Proxy Statement is materially deficient because it fails to disclose material information relating to Avenue management's best estimates of the Company's intrinsic value and prospects going forward.

46.    The Proxy Statement fails to disclose any of Avenue management's financial projections that were provided to and relied upon by the Company's financial advisor Oppenheimer in connection with its financial analyses.

47.    For example, the Proxy Statement sets forth:

In arriving at its opinion, Oppenheimer:

* * *

- reviewed financial forecasts and estimates relating to the Company (giving effect to the achievement of the development milestones on which the closing of the Merger Transaction is conditioned) prepared by the management of the Company, including estimates of contingent value payments pursuant to the CVR Agreement;

- reviewed estimates of certain deductions to the $180 million of the aggregate Merger Consideration provided to or discussed with Oppenheimer by the management of the Company;

* * *

- analyzed the estimated present value of the future cash flows of the Company (giving effect to the achievement of the development milestones on which the closing of the Merger Transaction is conditioned) and the contingent value payments pursuant to the CVR Agreement based on financial forecasts and estimates prepared by the management of the Company;

Proxy Statement at 29-30.

48.     In connection with Oppenheimer's *Discounted Cash Flow to Equity Analysis* ("DCF") of Avenue, the Proxy Statement further sets forth:

> Oppenheimer performed a discounted free cash flow to equity analysis to calculate the estimated present value of the *standalone after-tax free cash to equity flows that the Company was forecasted to generate during the fiscal years ending December 31, 2019 through December 31, 2036. **Financial data of the Company were based on financial forecasts and estimates prepared by the management of the Company.***

*Id.* at 33 (emphasis added).   Yet, the Proxy Statement **wholly omits**: (i) the financial projections prepared by the management of the Company relating to the Company for the fiscal years ending December 31, 2019 through 2036, that were provided to and relied upon by Oppenheimer in connection with its financial analyses; (ii) Avenue management's estimates of the contingent value payments pursuant to the CVR Agreement; (iii) the details of Avenue management's estimates of certain deductions to the $180 million of the aggregate Merger Consideration; and (iv) the definition of free cash to equity flows utilized in Oppenheimer's DCF and the line items used to calculate Avenue's free cash to equity flows.

49.     Without this information, Avenue stockholders are unable to evaluate the Merger Consideration, Avenue's financial future as a standalone entity, the accuracy of Oppenheimer's financial analyses, or make an informed decision whether the Proposed Transaction maximizes value for Avenue stockholders and serves their interests.

50.     The omission of this information renders the statements in the "Opinion of Oppenheimer & Co. Inc." section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

**Material Omissions Concerning Oppenheimer's Financial Analyses**

51.     The Proxy Statement describes Oppenheimer's fairness opinion and the various valuation analyses performed in support of its opinion.   However, the description of

Oppenheimer's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Avenue's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Oppenheimer's fairness opinion in determining whether to vote in favor of the Proposed Transaction or seek appraisal.  This omitted information, if disclosed, would significantly alter the total mix of information available to Avenue's stockholders.

52.     With respect to Oppenheimer's DCF, the Proxy Statement fails to disclose: (i) the free cash to equity flows that Oppenheimer utilized in its analysis; (ii) quantification of the inputs and assumptions underlying the discount rate range of 21.1% to 23.1%; (iii) the basis for applying declining perpetuity growth rates ranging from 4.0% to 3.0%. and (iv) quantification of the estimated fully-diluted shares of the Company's common stock, as provided by Company management, including estimated additional shares that would be issued by the Company in future equity financing transactions absent the Proposed Transaction.

53.     With respect to Oppenheimer's *Selected* Companies Analysis, the Proxy Statement fails to disclose: (i) the individual multiples and financial metrics for each of the selected companies analyzed by Oppenheimer in the analyses; (ii) Avenue's cash as of September 30, 2018; and (iii) quantification of the fully-diluted shares of the Company's common stock utilized by Oppenheimer in its analyses.

54.     When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

55.     The omission of this information renders the statements in the "Opinion of Oppenheimer & Co. Inc." section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

**Material Omissions Concerning the Background Process of the Proposed Transaction**

56.     The Proxy Statement omits material information relating to the sale process leading up to the Proposed Transaction.

57.     In connection with the sale process, the Proxy Statement states that, in connection with the Company meeting or conducting calls with interested royalty fund and potential partnership parties throughout the summer of 2018, 22 potential partners evaluated the Company. *See id.* at 23.  The Proxy Statement fails, however, to expressly indicate whether the Company entered into confidentiality agreements with any of the 22 parties, and if so, whether these confidentiality agreements are still in effect and/or contain "don't ask, don't waive" standstill provisions that are presently precluding these parties from making a topping bid for the Company.

58.     In addition, the Proxy Statement explicitly states that "[InvaGen] made an initial indication of intent at the end of July 2018.  The Company received two additional indications of intent from two other interested parties in August 2018."  *Id.* at 23.  However, the Proxy Statement fails to disclose the terms of InvaGen's July 2018 indication of intent as well as the terms of the two additional indications of intent Avenue received from additional parties in August 2018.  The Proxy Statement further fails to disclose the details of the counter offer Avenue sent InvaGen on August 31, 2018.  Accordingly, Company stockholders are left without the material information necessary to evaluate the competing level of interest that was submitted to Avenue.

59.     The omission of this information renders the statements in the "Background of the SPMA" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Potential Conflicts of Interest of Oppenheimer***

60.     The Proxy Statement fails to disclose material information concerning potential conflicts of interest faced by the Company's financial advisor Oppenheimer.

61.     For example, the Proxy Statement sets forth that "Oppenheimer and its affiliates in the past performed investment banking and other services for the Company unrelated to the Merger Transaction, for which services Oppenheimer and its affiliates received compensation, including having acted as sole book-running manager in connection with the initial public offering of the Company in 2017." *Id*. at 33.

62.     However, the Proxy Statement fails to disclose how much compensation Oppenheimer and its affiliates received for the past services performed for Avenue, including having acted as sole book-running manager in connection with the initial public offering of the Company in 2017.  The Proxy Statement further fails to disclose any financial advisory and/or other financial services Oppenheimer has provided to either Fortress or InvaGen and their respective affiliates in the two years prior to the signing of the SPMA, and any compensation Oppenheimer has received for such services.

63.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

64.     The omission of this information renders the statements in the "Opinion of Oppenheimer & Co. Inc." section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Company Insiders' Potential Conflicts of Interest***

65.     Further, the Proxy Statement fails to disclose material information concerning the potential conflicts of interest faced by Avenue insiders.

66.     The Proxy Statement, however, fails to disclose whether any of Avenue's executive officers or directors is continuing their employment following consummation of the Merger Transaction, as well as the details of all employment and retention-related discussions and negotiations that occurred between InvaGen and Avenue's executive officers, including who participated in all such communications, when they occurred and their content.  The Proxy Statement further fails to disclose whether any of InvaGen's prior proposals or indications of interest mentioned management retention in the combined company following the Merger Transaction or the purchase of or participation in the equity of the surviving corporation.

67.     Communications regarding post-transaction employment and merger-related benefits during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

68.     The omission of this information renders the statements in the "Background of the Merger" and "Interests of the Company's Directors and Executive Officers in the Stock Purchase

Transaction and the Merger Transaction" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

69.     The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed voting or appraisal decision in connection with the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

70.     Plaintiff repeats all previous allegations as if set forth in full.

71.     During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

72.     By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants.  It misrepresented and/or omitted material facts, including material information about Company management's financial projections, the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by the Company's financial advisor, the background process leading to the Proposed Transaction, and potential conflicts of interest faced by Oppenheimer

and Company insiders.  The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

73.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction or whether to seek to exercise their appraisal rights.

74.     By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

75.     Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

76.     Plaintiff repeats all previous allegations as if set forth in full.

77.     The Individual Defendants acted as controlling persons of Avenue within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Avenue, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

78.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

- 19 -

79. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy Statement.

80. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

81. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

82. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' conduct, Avenue's stockholders will be irreparably harmed.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Avenue, and against defendants, as follows:

A. Ordering that this action may be maintained as a class action and certifying

Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to Avenue stockholders;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  January 15, 2019

**O'KELLY ERNST & JOYCE, LLC**

By:  */s/ Ryan M. Ernst*
Ryan M. Ernst (#4788)
901 N. Market St., Suite 1000
Wilmington, DE 19801
Tel.: (302) 778-4000
Email: rernst@oelegal.com

**OF COUNSEL:**

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly K. Moran
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010

*Attorneys for Plaintiff*